```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


LAURENCE CHARLES SAUERS, III,   )
"TREY", LAURENCE CHARLES        )
SAUERS, II, and CAROL JONES     )
SAUERS,                         )
                                )
              Plaintiffs,       )
                                )
     v.                         )          1:15CV427
                                )
WINSTON-SALEM/FORSYTH COUNTY    )
BOARD OF EDUCATION, JULIA       )
EDMONDS, individually and in    )
her official capacity, KAYE     )
HUNTER, individually and in     )
her official capacity, BRAD     )
ROYAL, individually and in his  )
official capacity, ELLEN        )
WESTON, individually and in her )
official capacity, KARA         )
RICHARDSON, individually and    )
in her official capacity, MARY  )
TODD ALLEN, individually and in )
her official capacity, TINA     )
RAMSEY, individually and in     )
her official capacity, SAM      )
DEMPSEY, individually and in    )
his official capacity,          )
GRETCHEN TROUTMAN, individually )
and in her official capacity,   )
JONATHAN L. GARWOOD,            )
individually and in his         )
official capacity, MORGAN C.    )
THETEROW, individually and in   )
her official capacity, MARTHA   )
C. TEDROW, individually and in  )
her official capacity, and DR.  )
KENNETH SIMINGTON, individually )
and in his official capacity,   )
                                )
              Defendants.       )
```

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before this court are cross-motions for summary judgment. Plaintiffs Laurence Charles Sauers, III, Laurence Charles Sauers, II ("Trey"), and Carol Jones Sauers (collectively, "Plaintiffs") have filed a Motion for Summary Judgment, (Doc. 65), to which Defendant Winston-Salem Forsyth County Board of Education (the "School Board") has responded, (Doc. 70), and Plaintiffs have replied. (Doc. 77.) Likewise, the School Board has filed a Motion for Summary Judgment, (Doc. 63), to which Plaintiffs have responded, (Doc. 73), and the School Board has replied. (Doc. 75.)[1] These matters are now ripe for adjudication.

For the reasons stated herein, this court will remand the Individuals with Disabilities Education Act claim to the State Hearing Review Officer so that further proceedings consistent with this Memorandum Opinion can be ordered. This court will

---

[1] Also before this court is a Motion for Summary Judgment (Doc. 71) filed by Defendants Julia Edmonds, Kaye Hunter, Ellen Weston, Kara Richardson, Tina Ramsey, Gretchen Troutman, Jonathan L. Garwood, and Martha C. Tedrow (collectively, the "School Defendants"), to which Plaintiffs have responded, (Doc. 78), and the School Defendants have replied. (Doc. 81.) Further, the School Defendants have filed a related Motion to Strike, (Doc. 79), to which Plaintiffs have responded, (Doc. 85), and School Defendants have replied. (Doc. 86.) These motions remain under advisement and will be addressed in a separate, forthcoming order.

accordingly deny the parties' cross-motions for summary judgment without prejudice.

## I.   BACKGROUND

### A.   Individuals with Disabilities Education Act

Congress enacted the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., to "ensure[] that children with disabilities receive needed special education services." Fry v. Napoleon Cmty. Schs., ____ U.S. ____, ____, 137 S. Ct. 743, 748 (2017). By accepting federal funding under the IDEA, States agree to provide a "free appropriate public education" ("FAPE") to all children with qualifying disabilities. See 20 U.S.C. § 1401(3)(A)(i); Fry, 137 S. Ct. at 748. "As defined in the [IDEA], a FAPE comprises 'special education and related services' — both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." Fry, 137 S. Ct. at 748-49 (quoting § 1401(9), (26), (29)) (citation omitted).

School systems seeking to provide the required services create an "individualized education program" ("IEP") for each qualifying child. § 1414(d); Fry, 137 S. Ct. at 749. IEPs are created by the child's "IEP Team" consisting of school officials, teachers, and parents. § 1414(d)(1)(A)(i)(II)(bb),

(d)(1)(B); Fry, 137 S. Ct. at 749. The IEP "documents the child's current 'levels of academic achievement,' specifies 'measurable annual goals' for how she can 'make progress in the general education curriculum,' and lists the 'special education and related services' to be provided so that she can 'advance appropriately toward [those] goals.'" Fry, 137 S. Ct. at 749 (quoting § 1414(d)(1)(A)(i)(I), (II), (IV)(aa)).

A parent dissatisfied with the education provided to their child may file a complaint with the local or state educational agency in accordance with state law. Id. (citing § 1415(b)(6)). If a preliminary meeting between the parties cannot resolve the dispute, the matter continues on to a "due process hearing" before an impartial hearing officer.[2] Id. (citing § 1415(f)). At the due process hearing, the child's parents, as the party

---

[2] As another court in this district has explained:

> North Carolina employs a two-tiered administrative review system. The due process hearing is carried out by a hearing officer, an administrative law judge ("ALJ") selected by the North Carolina Office of Administrative Hearings. Parties aggrieved by the findings of the ALJ may appeal to the State Board of Education, which will appoint a state review officer knowledgeable about special education ("SRO") to review the ALJ's findings and decision. After the state level appeals process is exhausted, an aggrieved party may seek further review by bringing an action in a federal district court.

Cone v. Randolph Cty. Schs. Bd. of Educ., 657 F. Supp. 2d 667, 670 (M.D.N.C. 2009) (citation and footnote omitted).

seeking relief, have the burden of proving that the child was denied a FAPE. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 51 (2005). If the administrative officer finds that the child was denied a FAPE, the school system may be ordered to reimburse the parents for the costs of placing the child in an appropriate private school. See Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985); M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd., 553 F.3d 315, 324-25 (4th Cir. 2009). Those dissatisfied with the outcome of state proceedings may seek judicial review by filing a civil action in federal court. See 20 U.S.C. § 1415(i)(2); M.L. by Leiman v. Smith, 867 F.3d 487, 492 (4th Cir. 2017), cert. denied, ____ U.S. ____, 138 S. Ct. 752 (2018).

## II. **PROCEDURAL HISTORY AND FACTS UNDERLYING THE DISPUTE**

### A. **Prior Due Process Petitions**

As outlined by this court at the Motion to Dismiss stage, the relevant procedural history in this case extends back to 2011. Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ., 179 F. Supp. 3d 544, 549 (M.D.N.C. 2016). Plaintiffs first initiated a due process petition in 2011, after withdrawing from the Winston-Salem/Forsyth County Schools District ("WS-FCS District") to attend Triad Academy, a private school in Winston Salem, North Carolina, for Trey's ninth grade year. See id;

First Amended Complaint ("First Am. Compl."), Ex. 1, Final

Decision of Administrative Law Judge ("Final Decision of ALJ")

(Doc. 4-1) at 5. This petition was dismissed without prejudice.

Sauers, 179 F. Supp. 3d at 549. In 2012, Plaintiffs filed a

second petition and enrolled Trey in a different private school,

Kildonan, in New York. Sauers, 179 F. Supp. 3d at 549; Final

Decision of ALJ (Doc. 4-1) at 5. This petition was dismissed

with prejudice after the parties entered into a consent order

and settlement agreement which reimbursed educational expenses

and attorneys' fees related to both the 2011 and 2012 petitions.

Sauers, 179 F. Supp. 3d at 549.

Under the terms of the settlement agreement, the School

Board agreed to reimburse Plaintiffs for "educational expenses

already expended" and for attorneys' fees and costs related to

the matter. (First Am. Compl., Ex. 3, Consent Order and

Settlement Agreement (Doc. 4-3) at 3.) Plaintiffs also agreed to

release the School Board from claims arising out of matters

raised or that could have been raised in the 2011 or 2012

petitions, except in the event of a breach of the agreement.

(Id.) The settlement stated that moving Trey to Kildonan was

Plaintiffs' unilateral decision and that Kildonan would not be

considered Trey's "current educational placement" or "stay put"

placement under federal or state law for purposes of 2013–2014

placement. (Id. at 4.) The settlement agreement further stated

that it "in no way constitutes an acknowledgement by [the School

Board] that The Kildonan School is an appropriate educational

placement for [Trey]." (Id.) Looking forward to the next school

year, the settlement also included the following paragraph:

> Respondent will contract and pay for an
> Independent Educational Evaluation (IEE) at the public
> expense, to be conducted by an impartial, outside
> evaluator(s) agreed to by the Parties at the end of
> the 2012-2013 school year. Petitioners shall make
> [Trey] available for evaluation in North Carolina
> between May 15, 2012 and June 30, 2012. The IEE will
> include full psychological, educational, and assistive
> technology evaluations. After the IEE is complete,
> Respondent will promptly reconvene an IEP team meeting
> within twenty (20) days of Respondent's receipt of the
> IEE report(s) to develop an appropriate IEP for
> [Trey]. The IEP team will consider all placement
> options for the 2013-2014 school year, including
> private placement at public expense if appropriate.

(Id.) Pursuant to the settlement agreement, Plaintiffs

participated in IEP development meetings for the 2013-2014

school year, Trey's junior year, at Mount Tabor High School.

(Final Decision of ALJ (Doc. 4-1) at 5.) IEP meetings were held

on August 23, 2013, and September 25, 2013. (Id.)

### B.   August 23, 2013 IEP Meeting

Prior to the August IEP meeting, various members of the IEP

team and WS-FCS District staff requested all available

information about Trey from Kildonan. (Id. at 6.) Specifically,

they sought specific progress monitoring reports and information

as to Trey's skill work and levels of mastery. (Id. at 7.)
Instead, they received generic notes on Trey's work ethic. (Id.)
Pursuant to the previous settlement agreement, the WS/FCS
District, prior to the IEP meeting, had contracted with two
outside evaluators: Page Norris-Mikol, who conducted an
assistive technology evaluation, and Dr. Patricia Collins, who
had conducted psychological and educational testing on August
16 and 19, 2013. (Id.) The report of Dr. Collins was not yet
available at the time of the August 23 IEP meeting. (Id.) Prior
to the meeting, the IEP team developed a draft IEP, using
information available to them at the time: the Kildonan student
profile, Kildonan term reports, a 2012 outside evaluation by
Dr. Cecile Naylor, the assistive technology evaluation, and
information from Trey's records at Triad Academy and within the
WS-FCS District. (Id. at 6; Stipulated Exs. 2-3.)[3] The draft IEP
was provided to Plaintiffs prior to the IEP meeting. (Final
Decision of ALJ (Doc. 4-1) at 7.)

During the August IEP meeting, the IEP team developed
present levels and goals. (Id. at 8.) Plaintiffs did not express
concern regarding the goals of the IEP or request private
placement but instead focused primarily on the qualifications

---

[3] The Administrative Record in this case was filed manually,
(Doc. 49), as permitted by Local Rule 5.3(1)(c).

and training of the teachers and the School Board's ability to implement the IEP. (Id. at 8, 11.) The IEP team discussed which methodology to implement, and stated that it would continue to use an Orton-Gillingham based program. (Id. at 8.) Specifically, they chose an approach developed by the Institute for Multi-Sensory Education ("IMSE"), similar to that which Trey used at Kildonan. (Id.)

The IEP team also discussed accommodations and modifications that Trey would receive in both his regular education and special education classes, including: read aloud, dictation to scribe, scaffolded notes, modified assignments, preferential seating, mark in book, and second set of books. (Id.) For testing accommodations, the IEP team included extended time and small group/separate seating. (Id.)

The IEP team further discussed assistive technology, including the proposed accommodations of audio books, talking word processor, dictation software, and live scribe pen. (Id. at 9.) As a result of input from Plaintiffs, the team revised the draft to include a GoPro camera, a MacBook, and an iPad. (Id.) Efforts were made during this meeting and the following days to ensure that the technology would be ready for the first day of school the following Monday. (Id. at 9-10.)

Next, the IEP team discussed recommendations for special education service delivery. (Id. at 10.) The August draft IEP included ninety minutes of one-on-one reading instruction each day and ninety minutes of special education support in an inclusion[4] general education classroom for two additional core class periods. (Id.)

Finally, the IEP team discussed a continuum of educational placements, including regular, resource, separate, and private residential. (Id.) The team rejected regular placement because it would not meet Trey's needs and also rejected separate or residential placement as too restrictive and because it would prevent Trey from having enough time to access the general curriculum or his typically developing peers. (Id. at 10-11.) The IEP team determined that a resource level of special education services in a public school would be appropriate for Trey. (Id. at 11.) During this meeting, Plaintiffs did not request private placement for Trey, indicate that they felt the IEP did not provide a FAPE, or reject the IEP. (Id. at 11-12.)

---

[4] As stated by the ALJ, and as explained by the IEP team at the August meeting, inclusion classes are co-taught by a special education teacher and a regular education teacher. (Final Decision of ALJ (Doc. 4-1) at 10.) The teachers will often collaborate to ensure that lessons are differentiated to individual students' needs. (Id.) The special education teacher will monitor the needs of the special education students and spend group and individual time ensuring they are accessing the classroom lessons. (Id.)

The IEP team scheduled another meeting for September 12, 2013, for the purpose of discussing Dr. Collins' then-forthcoming report. (Id. at 13.)

At the conclusion of the August 23, 2013 meeting, Trey was still not enrolled in the WS-FCS District, but he was given an enrollment packet and Plaintiffs were assured that the school would be prepared for Trey's arrival on the first day of school, Monday, August 26, 2013. (Id. at 13.) To prepare for Trey's first day of school, WS-FCS District staff made various efforts between the IEP meeting on Friday and the first day, the next Monday. (Id.) These efforts included a guidance counselor meeting with Trey's family to discuss his schedule, purchasing the agreed-upon technology, staff meetings to further discuss Trey's schedule and teachers, a meeting to review Trey's IEP, and having an assistive technology specialist present on Monday morning to assist Trey in using technology during his transition. (Id.) On the first day of school, Trey never arrived. (Id.) Plaintiffs' attorney assured WS-FCS District's in-house counsel that Trey was anxious but would be enrolling that day. (Id. at 14.) Despite this, Plaintiffs never contacted the WS-FCS District to enroll. (Id.)

C.     **September 25, 2013 IEP Meeting**

The next IEP meeting was postponed at the request of
Plaintiffs and held on September 25, 2013.[5] (Id.) At this
meeting, the IEP team reviewed the expert report of Dr. Patricia
Collins, an expert in school psychology and the assessment and
evaluation of children with learning disabilities. (Id. at 6,
14-15.) This report was based on evaluations on August 16
and 19, 2013, but, as noted, was not available at the August IEP
meeting. (Id. at 7.) At the September IEP meeting, the Collins
report was interpreted by WS-FCS District psychologist
Dr. Corliss Thompson-Drew. (Id. at 15.) Both Trey's family and
WS-FCS District staff had an opportunity to meet with
Dr. Collins separately prior to the IEP meeting to discuss the
results of this evaluation. (Id. at 14.)

This report showed that Trey's reading skills were at
roughly a second grade level. (Id. at 15.) It noted that Trey's
time at Kildonan resulted in some progress in decoding
phonetically regular words, but had limited effect on his

_____

[5] The only contact Plaintiffs made with the WS-FCS District
between the August and September meetings was to reschedule the
September meeting from September 12 to September 25, stating
that they needed this time to prepare with their new attorney.
(Id. at 14.) During the September 25 meeting, it became apparent
that Plaintiffs were at Kildonan on September 12 and had
enrolled Trey the next day, in time for Kildonan's first day of
class. (Id. at 19.)

ability to decode a more generalized span of word challenges, his reading fluency, or his reading comprehension. (Id.) The Collins report also expressed skepticism that Trey's reading skills could be brought to a level sufficient to either support learning or successfully complete a high school curriculum. (Id.) In terms of recommendations, the Collins report suggested intense instruction in a specialized setting, small class size, assistive technology, and consideration of Trey's potential anxiety in the high school setting as a non-reader. (Id.) The report did not state that Trey could only be served in a private residential setting. (Id.)

The IEP team found this report consistent with Trey's previous testing and therefore did not change goals within the IEP. (Id.) The IEP's present levels of performance were updated to include data from the Collins report. (Id.) The team also reviewed the assistive technology recommendation, removing a scribe pen at the request of Plaintiffs. (Id. at 16.)

Plaintiffs then presented two reports, which were previously not shared with the IEP team, for the team's consideration. (Id. at 16.) One report was from Dr. Cecile Naylor, who evaluated Trey in June 2013,[6] and another was from

[6] There is no evidence to suggest that the WS-FCS District was aware that this report existed at the time of the August IEP meeting. (Id. at 16.)

Dr. Doreen Hughes, who Plaintiffs met for a consultation following the August IEP meeting. (Id.) The Naylor report was consistent with the Collins report as well as Trey's previous evaluations. (Id.) It recommended continued intensive and systematic instruction in reading as well as assistive technology accommodations. (Id.) The Naylor report does not state that Trey required private residential placement but did state that "I am unaware of public school options that could meet all of [Trey's] needs." (Id.; Stipulated Ex. 20 at 12.) The Hughes report agreed with the Naylor report, recommending intense and systematic instruction, likewise not stating that Trey required private residential placement but stating "I concur with Dr. Naylor's recommendation . . . regarding the need for placement in an educational setting that offers the intense and systematic instruction that Trey has received at Triad Academy and Kildonan." (Final Decision of ALJ (Doc. 4-1) at 17; Stipulated Ex. 22 at 2.) The Hughes report also indicated a diagnosis for adjustment disorder, reflecting Trey's experience of significant anxiety surrounding school. (Final Decision of ALJ (Doc. 4-1) at 17.) Neither the Collins report, nor the Naylor report, nor the Hughes report stated that Trey required private residential placement. (Id. at 15-17.)

Following this, in order to address Plaintiffs' concerns that Trey could become overwhelmed in his core classes, the IEP team added to Trey's schedule another ninety-minute special education class, intended to focus on support in study skills. (Id. at 17-18; Stipulated Exs. 4-5.) The study skills teacher would collaborate with Trey's core teachers to work on skill deficits, provide curriculum assistance, and work on assistive technology instruction. (Final Decision of ALJ (Doc. 4-1) at 17.) In total, the September IEP reflected that Trey's schedule would contain two ninety-minute blocks of special education in a small group setting, one ninety-minute inclusion class co-taught by one general education teacher and another special education teacher, and one elective. (Id. at 18.)

During the September IEP meeting, Trey's mother and Plaintiffs' attorney argued that attending Mt. Tabor would be detrimental to Trey's health. (Id.) The IEP team also learned that, following the August IEP meeting, Trey's behavior concerned his parents, who took him to see Dr. Frank Wood that Sunday, the day before the first day of school at Mt. Tabor. (Id.) At the conclusion of the September 25 meeting, Plaintiffs rejected the IEP and informed the IEP team, for the first time, that Trey was currently attending Kildonan and would be staying there. (Id. at 19.)

**D.    The Instant Due Process Petition**

Following the August and September IEP meetings, Plaintiffs filed a third due process petition, which alleged that Trey's IEP for the 2013–2014 school year failed to provide him with a FAPE. (Id. at 5.) This petition sought reimbursement for Trey's private school tuition for the 2013–2014 and 2014–2015 school years.[7] Sauers, 179 F. Supp. 3d at 549.

A hearing on the petition was held before the Honorable Selina M. Brooks, Administrative Law Judge, on October 15, 2014, in Winston Salem, North Carolina; on November 17-18, and 20, 2014, in Thomasville, North Carolina; and on November 24, 2014, in Lexington, North Carolina. (Final Decision of ALJ (Doc. 4-1) at 1.) The issues before the ALJ were as follows:

(1) Did the Winston-Salem/Forsyth County Board of Education offer Trey a FAPE for the 2013-2014 school year?

(2) If it is found that the Board did not offer Trey a FAPE for the 2013-2014 school year, do Plaintiffs have a claim for reimbursement for the private program selected for the 2013-2014 school year, and if so, was the private program appropriate?

---

[7] A request for then-prospective relief (as to the 2014-2015 school year) was not made in the operative complaint before this court and is thus not considered. (First Am. Compl. (Doc. 4) ¶¶ 3-4; see also Pls.' Mem. of Law in Supp. of their Mot. for Summ. J. ("Pls.' Mem.") (Doc. 66) at 2 (referencing only the 2013-2014 school year).)

(3) If it is found that the Board did not offer Trey a FAPE for the 2013-2014 school year, do Plaintiffs have a claim for reimbursement for the private program selected for the 2014-2015 school year, and if so, was the private program appropriate?

(4) To what reimbursement, if any, are Plaintiffs petitioners entitled? (Id. at 2.)

At the hearing, further context to the August and September IEP meetings was provided through testimony of members of the IEP team as well as various experts. Plaintiffs made clear that they were not challenging the appropriateness of goals or methodology contained in the IEP. (Final Decision of ALJ (Doc. 4-1) at 8.) Most of Plaintiffs' complaints about the IEP were directed towards its implementation. (Id. at 8-9 (reflecting that Trey's mother testified that she did not believe testing accommodations could be implemented without stigmatizing Trey or causing him to miss instruction); id. at 9 (reflecting Plaintiffs' expert testifying that use of assistive technology could be isolating and stigmatizing for Trey); id. at 11 (reflecting Plaintiffs' concern about the level of teacher training and experience).) Several staff members of the WS-FCS District testified as to how testing accommodations and assistive technology are successfully implemented for other students. (Id. at 9.) Testimony as to the qualifications,

trainings, supervision, and ongoing education of WS-FCS District staff who would have worked with Trey was heard. (Id. at 11-12.)

In response to Plaintiffs' concerns about class size, a WS-FCS District employee testified that the IEP team planned to enroll Trey in an inclusion English class with twenty students (a ten-to-one student-to-teacher ratio, given that this class was co-taught). (Id. at 10.) Evidence was introduced that the student-to-teacher ratio at Kildonan during Trey's previous year there ranged from eight-to-one to twelve-to-one. (Id.)

The School Board's expert in the field of administration of special education in public schools and the curriculum of children with disabilities, Sam Dempsey, testified as to the adequateness of teacher training. (Id. at 8.) The School Board's expert in the field of teaching, administration of special education in public schools, and curriculum for children with disabilities, Carol Fish, testified as to how the expert reports presented at the IEP meetings were taken into consideration as well as to teacher training. (Id. at 7, 15.)

Dr. Patricia Collins, an expert in the field of school psychology and the assessment and evaluation of children with learning disabilities who conducted an evaluation of Trey for the purposes of IEP development, testified that the IEP was a good educational plan and that she had not seen another public

school district go to this extent to provide special education services. (Id. 5-6, 14.)

Plaintiffs' expert in the field of child development, special education, and the assessment and evaluation of children with learning disabilities in the area of reading, Dr. Rebecca Felton, testified that the proposed methodology would not be appropriate for a high school student with a severe reading disability, but admitted that she was not extensively familiar with the program nor the training of the teachers in the District. (Id. at 6, 12.) She further testified that an inclusion classroom with a small student-to-teacher ratio and properly-trained teachers could work for a student like Trey. (Id.)

Plaintiffs' expert in the field of the assessment, evaluation, and management of children with learning disabilities including dyslexia, Dr. Frank Wood, testified that he was familiar with the IMSE program and that a teacher working with Trey should have more than thirty hours of training. (Id. at 12.) He had not visited an inclusion classroom at Mt. Tabor nor was he familiar with the teaching credentials of those teachers who the IEP team planned to have work with Trey. (Id.)

The ALJ made an explicit finding as to the above-mentioned experts:

The Undersigned finds the testimony of Mr. Dempsey and Ms. Fish to be more persuasive than the testimony of Dr. Felton and Dr. Wood on the issue of the implementation of special education programming in public schools and curriculum for children with disabilities because of their education credentials and extensive experience with both the teaching and administration of special education programming in public schools.

(Id. at 12.)

Finally, adding further context onto the events following the August IEP meeting in which Trey's parents became concerned by his behavior, Plaintiffs' expert in the field of psychiatry and behavioral medicine, Dr. Doreen Hughes, testified. (Id. at 16-17.) She testified that, during this course of events, she did not find Trey to be suicidal and that she was not aware of instances where Trey was not able to continue his educational program despite experiencing school-related anxiety. (Id. at 17.) The ALJ found the testimony of Dr. Hughes credible as to Trey's emotional state following the August IEP meeting. (Id. at 17.)

This third petition was dismissed with prejudice by the ALJ, who found that the IEP developed by the School Board afforded Trey an FAPE for the 2013-2014 school year, that Plaintiffs did not prove that the School Board did not have the capacity to implement the IEP, and that Plaintiffs were not

entitled to reimbursement for either the 2013-2014 or 2014-2015 school years. (Id. at 24.)

Plaintiffs appealed this decision to the State Board of Education and a State Hearing Review Officer ("SRO"). (First Am. Compl., Ex. 2, Decision of State Hearing Review Officer (Doc. 4-2) at 1). On May 1, 2015, SRO Joe D. Walters upheld the decision of the ALJ. (Id. at 14.) The SRO found the ALJ's fact findings to have been regularly made and incorporated them into his decision without restatement. (Id. at 4.)

### E. **Proceedings before this Court**

Having exhausted their administrative remedies as required by statute in order to bring an IDEA claim in this court, 20 U.S.C. § 1451(i)(2)(A), Plaintiffs appealed the decisions of the ALJ and SRO and brought several other claims against the School Board and School Defendants. (See First Am. Compl. (Doc. 4) ¶¶ 86-143). While this court dismissed several of the claims against School Defendants at the motion to dismiss stage, the motion did not seek dismissal of the IDEA claims, which remain pending. See Sauers, 179 F. Supp. 3d at 550.

III. **ANALYSIS**

A. **Legal Standard**

As a general matter, summary judgment is appropriate when an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issue of material facts exists, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

In IDEA cases at the summary judgment phase, however, the district court "is obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." MM ex rel. DM v. Sch. Dist. of Greenville Cty., 303 F.3d 523, 530–31 (4th Cir. 2002) (citations omitted); see also Cone v. Randolph Cty. Schs. Bd. of Educ., 657 F. Supp. 2d 667, 673 (M.D.N.C. 2009) ("When a party files a motion for summary judgment challenging a state administrative ruling under the IDEA, the motion 'may more aptly be described . . . as a motion for summary adjudication.'" (citation omitted)). "While the court must make an independent determination on whether the school complied with the IDEA, the hearing officer's factual findings are considered prima facie correct." M.L. by Leiman, 867 F.3d at 493 (citation omitted). Credibility determinations, both implicit and explicit, are included in the findings

entitled to deference by the reviewing court.[8] <u>Cty. Sch. Bd. of</u>
<u>Henrico Cty. Va. v. Z.P. ex rel. R.P.</u>, 399 F.3d 298, 307 (4th
Cir. 2005) (citation omitted).

Federal courts should not "substitute their own notions of
sound educational policy for those of local school
authorities[.]" <u>Hartmann ex rel. Hartmann v. Loudoun Cty. Bd. of</u>
<u>Educ.</u>, 118 F.3d 996, 999 (4th Cir. 1997); <u>accord</u> <u>E.L. ex rel.</u>
<u>Lorsson v. Chapel Hill-Carrboro Bd. of Educ.</u>, 773 F.3d 509, 517
(4th Cir. 2014). Furthermore, "[w]here the administrative
proceedings are two-tiered and 'the Hearing Officer and
Reviewing Officer have reached the same conclusion, a reviewing
court is obligated to accord greater deference to their
findings.'" <u>G ex rel. RG v. Fort Bragg Dependent Schs.</u>, 343 F.3d
295, 302-03 (4th Cir. 2003) (citation omitted).

If the administrative findings of fact were not "regularly
made," however, they are not entitled to deference. <u>Z.P. ex rel.</u>
<u>R.P.</u>, 399 F.3d at 305; <u>accord</u> <u>E.L. ex rel. Lorsson</u>, 773 F.3d at
517. "Factual findings are not 'regularly made' if they are
reached through a process that is 'far from the accepted norm of

---

[8] This deference is limited to factual findings, however.
Courts must make an independent, de novo determination as to the
IDEA's legal requirements. <u>Cone</u>, 657 F. Supp. 2d at 673 n.7;
<u>Fitzgerald v. Fairfax Cty. Sch. Bd.</u>, 556 F. Supp. 2d 543, 550
(E.D. Va. 2008); <u>Alexis v. Bd. of Educ. for Baltimore Cty. Pub.</u>
<u>Schs.</u>, 286 F. Supp. 2d 551, 556 (D. Md. 2003).

a fact-finding process.'" Z.P. ex rel. R.P., 399 F.3d at 305
(citation omitted). "[I]f a reviewing court fails to adhere to
[the findings of fact], it is obliged to explain why." G ex rel.
RG, 343 F.3d at 302.

Finally, just as the plaintiff bears the burden of
establishing that the student was denied a FAPE at the due
process hearing, Weast v. Schaffer ex rel. Schaffer, 377 F.3d
449, 456 (4th Cir. 2004), aff'd, 546 U.S. 49 (2005), so must the
party challenging an administrative decision below carry this
burden at the district court. Barnett by Barnett v. Fairfax Cty.
Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991); see also Z.P. ex
rel. R.P., 399 F.3d at 313.

### B.    Administrative Findings of Fact

The School Board insists that the findings of fact made by
the ALJ and then incorporated by the SRO into his Final Decision
were regularly made and should thus be given due weight and
considered to be prima facie correct. (See Mem. of Law in Supp.
of Def. Winston-Salem/Forsyth Cty. Board of Educ.'s Mot. for
Summ. J. (Doc. 64) at 13.) Plaintiffs, on the other hand,
contend for a variety of reasons that the administrative
findings should not be given due weight.

In determining whether a hearing officer's findings were
regularly made, the Fourth Circuit's cases "have typically

focused on the process through which the findings were made[.]"
J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va., 516
F.3d 254, 259 (4th Cir. 2008). "Factual findings are not
'regularly made' if they are reached through a process that is
'far from the accepted norm of a fact-finding process.'" Z.P. ex
rel. R.P., 399 F.3d at 305 (citation omitted). Reversing a
district court that found administrative findings of fact to not
be regularly made, the Fourth Circuit has described what a
regular fact-finding process might look like:

> In this case, there is nothing in the record suggesting
> that the hearing officer's process in resolving the
> case was anything other than ordinary. That is, the
> hearing officer conducted a proper hearing, allowing
> the parents and the School Board to present evidence
> and make arguments, and the hearing officer by all
> indications resolved the factual questions in the
> normal way, without flipping a coin, throwing a dart,
> or otherwise abdicating his responsibility to decide
> the case.

J.P. ex rel. Peterson, 516 F.3d at 259.

The Fourth Circuit has also assumed that "the manner in
which a hearing officer's factual findings are presented could
be so deficient as to deprive the opinion of the deference to
which it would otherwise be entitled[.]" Id. at 260 (citation
omitted). Finding the factual findings as presented in the case
before it to be adequate, the court made clear that, "our case
law does not require an IDEA hearing officer to offer a detailed
explanation of his credibility assessments." Id. at 261

(citation omitted). "[I]mplicit credibility assessments 'are as entitled to deference . . . as explicit findings.'" Id. (citation omitted).

Plaintiffs first argue that the ALJ and SRO improperly assigned greater weight to testimony of educators than to testimony of medical experts. (Pls.' Mem. of Law in Supp. of their Mot. for Summ. J. ("Pls.' Mem.") (Doc. 66) at 8-13.) Plaintiffs' arguments on this issue revolve entirely around how the ALJ and SRO weighed expert testimony. (Id. at 9 (stating that the ALJ and SRO "elevated the basic educational opinions of representatives of Defendant Board over the specialized medical, neurological, and psychological opinions of the experts offered by Plaintiffs.").) Specifically, Plaintiffs note that Dr. Patricia Collins, who was admitted as an expert in school psychology and the assessment and evaluation of children with learning disabilities, testified that "the appropriate reading instruction for Trey at this point in time is beyond my experience and expertise and is best left to those relatively few individuals with experience teaching students with this level of very significant challenges." (Final Decision of ALJ (Doc. 4-1) at 6; Pls.' Mem. (Doc. 66) at 10.) With Dr. Collins' testimony in mind, Plaintiffs then point to Carol Fish, the director of WS-FCS District's high school exceptional children's

programs, who was admitted as an expert in the field of teaching, administration of special education in public schools, and curriculum for children with disabilities. (Final Decision of ALJ (Doc. 4-1) at 7; Pls.' Mem. (Doc. 66) at 10.) Plaintiffs also point to Sam Dempsey, who was admitted as an expert in the field of administration of special education in public schools and the curriculum of children with disabilities. (Final Decision of ALJ (Doc. 4-1) at 8; Pls.' Mem. (Doc. 66) at 10.) Plaintiffs contends that neither the testimony of Ms. Fish nor Mr. Dempsey "revealed any familiarity with triple-deficit dyslexia, either in [himself or herself], in the teachers [and/or school employees they] supervised, or in the accommodations the IEP team had developed for Plaintiff Trey for the 2013-2014 school year." (Pls.' Mem. (Doc. 66) at 10.) Plaintiffs assert that their experts, Dr. Felton, who was admitted as an expert in the field of child development and learning disabilities in the area of reading, and Dr. Wood, who was admitted as an expert in the field of neuropsychology, (Final Decision of ALJ (Doc. 4-1) at 6, 12), by contrast had extensive experience with dyslexic students. (Pls.' Mem. (Doc. 66) at 11.) Plaintiffs contend that the ALJ and SRO, discounting this fact, gave "undue weight to the general opinions of

Mr. Dempsey and Ms. Fish as to educating students with general reading disabilities." (Pls.' Mem. (Doc. 66) at 12.)

The ALJ made an explicit finding as to the expert testimony in question, finding the testimony of Mr. Dempsey and Ms. Fish to be more persuasive than that of Dr. Felton and Dr. Wood. (Final Decision of ALJ (Doc. 4-1) at 12.) In support of this finding, the ALJ noted that Dr. Felton's knowledge about the IMSE program was limited to what she read online and that both Dr. Felton and Dr. Wood were unfamiliar with the training and experience of the teachers who would work with Trey at Mt. Tabor. (See id.) The ALJ further noted that Dr. Wood had not visited an inclusion classroom at Mt. Tabor in recent years and was not familiar with successful use of inclusion classrooms for other students with serious reading disabilities. (See id.)

Plaintiffs' arguments amount to direct challenges to the ALJ's credibility determinations, which are entitled to the same deference as explicit factual findings. J.P. ex rel. Peterson, 516 F.3d at 261; Z.P. ex rel. R.P., 399 F.3d at 307. Here, Plaintiffs' argument "is reducible to the sour grapes claim that the ALJ was simply wrong in failing to rely on the testimony" of their preferred witnesses. A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 329 (4th Cir. 2004) (finding that the district court erred in dismissing the administrative findings).

Plaintiffs further argue that the ALJ "disregarded the fact that the teacher selected for Plaintiff Trey had undergone only thirty hours of training in the Orton-Gillingham method which, by Mr. Dempsey's testimony, prepared teachers to teach up to a third-grade reading level." (Pls.' Mem. (Doc. 66) at 12.) Plaintiffs also accuse the SRO of "[w]ithout analysis, . . . merely h[olding] that Plaintiffs' arguments were unconvincing." (Id.)

First, both parties introduced significant evidence at the administrative hearing as to the experience of the various educators who planned to work with Trey, which is reflected in the Final Decision of the ALJ. (See, e.g., Tr. Vol. III at 565, 575-80, 586-87, 607, 638-40, 691-92, 737, 743, 748-50, 756-57; Pet'rs' Ex. 6; Final Decision of ALJ (Doc. 4-1) at 11-12.)

Second, to the extent Plaintiffs argue that the School Board did not have the capacity to implement the IEP, the ALJ made a specific finding that "Petitioners failed to prove that Respondent did not have the capacity to implement the IEPs developed for the 2013-2014 school year or that the teachers assigned to implement Trey's special education services were not sufficiently trained." (Final Decision of ALJ (Doc. 4-1) at 24.) In their reply, Plaintiffs point to G ex rel. RG v. Fort Bragg Dependent Schools, 343 F.3d 295 (4th Cir. 2003), as holding

"that a school district's ability to implement an IEP, including the training and qualifications of teachers, is a factor to consider in determining whether a disabled child has or has not been provided a FAPE." (Pls.' Reply Br. in Opp'n to Def. Winston-Salem Forsyth County Board of Education's Resp. to Pls.' Mot. for Summ. J. ("Pls.' Reply Br.") (Doc. 77) at 8.)

Plaintiffs' reliance on this case is misplaced. As a preliminary matter, the Fourth Circuit in G ex rel. RG stated, "we ordinarily would owe deference to [the school system's] simple assertion that it is capable of implementing the . . . IEP[.]" 343 F.3d at 307 (citing MM ex rel. DM v. Sch. Dist. of Greenville Cty., 303 F.3d 523 (4th Cir. 2002)). This suggests that, in a garden variety IDEA case, ability to implement an IEP is not considered at length. G ex rel. RG, however, presented a unique situation. There, the parties agreed that the IEP was adequate as written, but disagreed as to whether the school system was able to implement the IEP. Id. at 306. The first administrative review of the IEP in question was deemed by the Fourth Circuit to have been based on an improper standard, that is, "not on an analysis of whether the . . . IEP was 'reasonably calculated to provide educational benefit' to [the child], but instead on examination of whether that IEP would replicate the benefit to [the child] of the complete" version of the same

methodology proposed by the IEP that the child had previously received in another setting, "which had been successful for him." Id. at 307 (citation omitted). Moving forward on appeal, neither the next administrative review body nor the district court addressed the school system's ability to implement the IEP as written "or provided an independent assessment of the educational benefit [the child] would receive from that IEP." Id. at 307-08. The Fourth Circuit concluded that the record and arguments before it were "not sufficient to support a reasoned analysis and conclusion . . . on the issue of [the school system's] ability to implement the . . . IEP as proposed." Id. at 308. Due to this, the Fourth Circuit reversed the district court's judgment on this issue and remanded for further proceedings sufficient to resolve the parties' dispute under the proper standard. Id.

Here, the administrative record contains extensive evidence relating to teacher training and qualifications. The ALJ made numerous factual findings relating to this issue. (Final Decision of ALJ (Doc. 4-1) at 11-12.) The SRO then found the ALJ's findings of fact to be regularly made and incorporated them into his decision without restating them. (Decision of State Hearing Review Officer (Doc. 4-2) at 4.)

Furthermore, the ALJ made a specific finding as to the ability of the WS-FCS District to implement the IEP: "Petitioners failed to prove that Respondent did not have the capacity to implement the IEPs developed for the 2013-2014 school year or that the teachers assigned to implement Trey's special education services were not sufficiently trained." (Final Decision of ALJ (Doc. 4-1) at 24.) The SRO, while not making a finding specific to this issue, made a broader finding, agreeing with the ALJ that "[t]he Petitioners have not met their burden of proving that the Respondent failed to offer Trey a free appropriate public education for both the 2013-2014 and 2014-2015 school years." (Decision of State Hearing Review Officer (Doc. 4-2) at 14.) Thus, unlike in G ex rel. RG, this case contains a developed record and ample arguments sufficient for this court to conduct a reasoned analysis as to this issue.

Finally, Plaintiffs argue in their reply that, because the ALJ's decision was handed down prior to the Supreme Court's recent decision in Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. ___ , 137 S. Ct. 988 (2017), that the ALJ "analyzed the evidence under an improper standard" and its decision is therefore not entitled to deference. (Pls.' Reply Br. (Doc. 77) at 6-7.) Defendant, in its reply, argues that the standard rejected in Endrew is neither the standard that has

been applied by the Fourth Circuit nor is it the standard applied in this case by the ALJ or SRO. (Reply in Supp. of Def. Winston-Salem/Forsyth Cty. Bd. of Educ.'s Mot. for Summ. J. (Doc. 75) at 4-5.)

In Endrew, the Supreme Court rejected the Tenth Circuit's "more than de minimis" FAPE standard. Endrew, 137 S. Ct. at 1000-01. The Tenth Circuit had interpreted Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley, 458 U.S. 176 (1982) to establish a rule that "a child's IEP is adequate as long as it is calculated to confer an 'educational benefit [that is] merely . . . more than de minimis[.]'" Endrew, 137 S. Ct. at 997 (citation omitted). In other words, the Supreme Court rejected the notion that "some progress[,]" as long as it is more than de minimis, is adequate. Id. at 1001 ("[A] student offered an educational program providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all."). The Endrew court made clear that the IDEA demands more than this by clarifying that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id. at 999. "The goals may

differ, but every child should have the chance to meet challenging objectives." Id. at 1000.

Following Endrew, the Fourth Circuit's FAPE standard has come into question. See M.L. by Leiman, 867 F.3d at 496 ("Our prior FAPE standard is similar to that of the Tenth Circuit, which was overturned by Endrew F. We have cited to the Tenth Circuit's standard in the past, including that court's decision in Endrew F. itself." (citations omitted)). In O.S. v. Fairfax County School Board, 804 F.3d 354, 360 (4th Cir. 2015), the Fourth Circuit rejected arguments that a FAPE required "meaningful benefit" and stated that, "[i]n this circuit, the standard remains the same as it has been for decades: a school provides a FAPE so long as a child receives some educational benefit, meaning a benefit that is more than minimal or trivial, from special instruction and services." Id. at 360. This is similar to the Tenth Circuit standard rejected by the Supreme Court in Endrew. M.L. by Leiman, 867 F.3d at 496.

As a preliminary matter, were this court to find that the ALJ and SRO did not apply a standard consistent with the Endrew opinion, the proper remedy would be remanding the case to the state administrative bodies for further consideration in light of Endrew, not to determine that their findings are not entitled to deference and proceed ahead. Compare N.P. by S.P. v. Maxwell,

711 F. App'x 713, 719 (4th Cir. 2017) ("We need not fully explore the impact of Endrew in this case, however. Both the ALJ and the district court wrote their opinions prior to Endrew. In fact, the ALJ quotes the 'more than de minimis' standard in her opinion. The ALJ – the only person to see the witnesses testify in person – should have the opportunity to decide in the first instance whether the outcome of the case is different under the standard articulated by the Supreme Court in Endrew."), with J.R. v. Smith, Civil Action No. DKC 16-1633, 2017 WL 3592453, at *4 (D. Md. Aug. 21, 2017) (finding that, where an ALJ "went beyond the 'more than de minimus' standard  from O.S. and laid out an approach that evaluated what progress was appropriate in light of the child's circumstances, just as Endrew F. requires[,]" remand was not required).

In this case, contrary to Defendants' arguments, the ALJ and SRO both applied a Fourth Circuit standard subject to serious uncertainty post-Endrew. Although nowhere in either the ALJ's or the SRO's decision does either cite to a "more than de minimis" standard or to O.S., it remains unclear whether the standards applied by the ALJ and SRO are consistent with Endrew's clarification of the Rowley standard. First, the ALJ repeatedly cites to cases referring to "educational benefit[,]" "sufficient support services to permit the child to benefit

educationally[,]" and "sufficient to confer some educational
benefit upon the handicapped child[.]" (Final Decision of ALJ
(Doc. 4-1) at 19-20.) Adding context as to what the ALJ
considered to be "some educational benefit[,]" the opinion
states, "[t]he IDEA requires an education plan likely to produce
progress, not regression or trivial educational advancement."
(Id. at 20 (citing Hall v. Vance Cty. Bd. of Educ., 774 F.2d
629, 636 (4th Cir. 1985)). While not entirely clear, this
language, taken as a whole, seems to imply that a standard
requiring minimal progress may have been considered adequate by
the ALJ. Similarly, the SRO recited to standards that referred
to "educational benefits" but did not expound upon exactly where
on the spectrum said benefits were deemed adequate. (Decision of
State Hearing Review Officer (Doc. 4-2) at 9.) While Endrew was
decided well after both the ALJ and the SRO considered this case
and neither can be faulted for not preemptively guessing that
the Fourth Circuit's standard would come into question, this
court finds it appropriate to remand the case to the state
administrative bodies for review under the current standard
established by Endrew. "The ALJ – the only person to see the
witnesses testify in person – should have the opportunity to
decide in the first instance whether the outcome of the case is

different under the standard articulated by the Supreme Court in Endrew." <u>N.P. by S.P.</u>, 711 F. App'x at 719.

**IV.** **CONCLUSION**

For the reasons stated herein, **IT IS HEREBY ORDERED** that this action is **REMANDED** to the State Hearing Review Officer for further proceedings consistent with this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that the parties' motions for summary judgment (Docs. 63, 65) are **DENIED WITHOUT PREJUDICE.**

This the 30th day of March, 2018.

_____
United States District Judge